IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF KANSAS

KANSAS HEART HOSPITAL, L.L.C., )
et al.,                        )
                               )
                Plaintiffs,    )      **CIVIL ACTION**
                               )
v.                             )      No. 06-1345-MLB
                               )
EXECUTIVE RISK INDEMNITY, INC.,)
                               )
                Defendant.     )
_____)

<u>**MEMORANDUM AND ORDER**</u>

**I.  PROCEDURAL HISTORY**

     This matter comes before the court on cross motions for summary
judgment.  Defendant Executive Risk Indemnity Inc. ("Executive Risk")
filed a motion for summary judgment (Doc. 35) and a memorandum in
support (Doc. 36).  In response, plaintiffs Kansas Heart Hospital,
L.L.C. ("Kansas Heart Hospital"), Cardiac Associates of Wichita, Inc.
("Cardiac Associates"), and Cardiac Health of Wichita, Inc. ("Cardiac
Health") filed a joint motion for partial summary judgment (Doc. 41)
and a supporting memorandum (Doc. 42) that also responds in opposition
to Executive Risk's motion for summary judgment.  Executive Risk filed
a memorandum in opposition to plaintiffs' joint partial motion and a
reply to its initial motion for summary judgment (Doc. 47).  Finally,
plaintiffs filed a joint reply brief (Doc. 48).

     This is a dispute over insurance coverage.  Plaintiffs sought
reimbursement for defense costs related to claims made against them,
and after initially agreeing to cover those costs, Executive Risk
ultimately denied coverage under the parties' insurance contract.

Plaintiffs filed suit in the Sedgwick County District Court, Kansas, in October 2006, and the case was removed by Executive Risk to this court shortly thereafter.  Plaintiffs' state court petition stated three claims: liability for defense and related costs before Executive Risk denied coverage; liability for defense and related costs incurred post-denial of coverage; and a request for a declaratory judgment that Executive Risk is obligated by the parties' insurance contract to defend and/or indemnify plaintiffs for these defense costs.  (Doc. 1 Exh. A.)

Executive Risk's motion for summary judgment and plaintiffs' joint partial motion for summary judgment are both denied in part and granted in part for the reasons stated more fully herein.

## II.  FACTS

### A.  The Parties' Contract

Executive Risk issued a "Diversified Health Care Organization Directors and Officers Liability Insurance Policy" to Kansas Heart Hospital, for the policy period January 1, 2005 to January 1, 2006 (the "Policy" or the "2005 Policy").  As stated on the declarations page, Executive Risk issued the Policy to Kansas Heart Hospital in Wichita, Kansas.  Executive Risk also issued a "Diversified Health Care Organization Directors and Officers Liability Insurance Policy," bearing the same policy number, to Kansas Heart Hospital for the policy period January 1, 2004 to January 1, 2005 (the "2004 Policy"). The 2005 Policy and the 2004 Policy contain the same relevant terms, conditions, and exclusions with respect to the matters at issue in this action.

Section I of the Policy includes the following insuring

agreements:

> (B) The Underwriter will pay on behalf of the Company:
>
> > (1) Loss from Claims first made against the Insured Persons during the Policy Period for Wrongful Acts, including Employment Practices Wrongful Acts, if the Company pays such Loss to or on behalf of the Insured Persons as indemnification; and
> >
> > (2) . . . if it is stated in the Declarations that coverage has been made available under this INSURING AGREEMENT (B)(2), Loss from Claims first made against the Company during the Policy Period for Wrongful Acts, including Employment Practices Wrongful Acts.
>
> (C) As part of and subject to the limit of liability stated in ITEM 3 of the Declarations, the Underwriter will have the right and the duty to defend any Claim as described in the INSURING AGREEMENTS, even if such Claim is groundless, false or fraudulent.

Section II of the Policy sets forth the definitions used throughout the Policy, including:

> (B) "Claim" means written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act. A Claim will be deemed to have been made when such written notice is first received by any Insured.
>
> (C) "Company" means the Parent Corporation and any Subsidiary created or acquired on or before the Inception Date in ITEM 2(a) of the Declarations or, subject to CONDITION (H), during the Policy Period.
>
> . . .
>
> (H) "Insured" means the Company and any Insured Person.
>
> (I) "Insured Person" means:
>
> > (1) any past, present or future director, officer or member manager of the Company; . . .

. . .

(K) "Parent Corporation" means the entity named in ITEM 1 of the Declarations [Item 1 identifies Kansas Heart Hospital].

. . .

(M) "Related Claims" means all Claims based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving the same or related facts, circumstances, situations, transactions or events or the same or related series of facts, circumstances, situations, transactions or events, whether related logically, causally, or in any other way.

. . .

(Q) "Wrongful Act" means:

(1) any Employment Practices Wrongful Act by an Insured Person in his or her capacity as a director, officer, member manager or employee of the Company;

(2) any other actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Insured Person in his or her capacity as a director, officer or member manager of the Company;

(3) any matter asserted against an Insured Person solely by reason of his or her status as a director, officer or member manager of the Company; and

(4) any Employment Practices Wrongful Act by the Company or any other actual or alleged error, omission, misstatement, misleading statement or breach of duty by the Company; provided, that this DEFINITION (Q)(4) will only apply if it is stated in the Declarations that coverage has been made available under INSURING AGREEMENT (B)(2).

By endorsement, the Policy amends the definition of Insured, as follows:

(1) The term "Insured," as defined by Section II Definitions of the Policy, is amended to include

-4-

Cardiac Health of Wichita, Inc. and Cardiac
Associates of Wichita, Inc. (the
"Co-Defendants"), but only if and to the extent
that any such Co-Defendants are included in a
Claim made and continuously maintained against an
Insured (exclusive of the Co-Defendants) as a
defendant or defendants in such Claim for one or
more Wrongful Acts (a "Co-Defendant Claim").

(2) No coverage will be available under this
Policy for any Claim made against any
Co-Defendant other than Co-Defendant Claims.

The Policy's Conditions section discusses the treatment of
"Related Claims." It states:

IV. CONDITIONS

. . .

(G) Notice; Timing and Interrelationship of
Claims:

. . .

(4) All Related Claims will be treated as a
single Claim made when the earliest of such
Related Claims was first made, or when the
earliest of such Related Claims is treated
as having been made in accordance with
CONDITION (G) (2), whichever is earlier.

Executive Risk contends that three separate Policy provisions
apply to exclude coverage for plaintiffs. As amended by endorsement,
the Policy includes a "Securities Exclusion" that provides, in part,
as follows:

In consideration of the premium charged, no
coverage will be available under this Policy for
Loss, including Defense Expenses, resulting from
any Claim based on, arising out of, directly or
indirectly resulting from, in consequence of, or
in any way involving any actual or alleged
violation of:

(1) the Securities Act of 1933, the
Securities Exchange Act of 1934, the
Investment Company Act of 1940, any other
federal law with respect to the regulation

-5-

of securities, any rules or regulations of
the United States Securities and Exchange
Commission, or any amendment of any such
law, rule or regulation; or

(2) any state securities or "Blue Sky" laws
or rules or regulations, or any amendment of
any such laws, rules or regulations; or

(3) any provision of any federal, state, or
local statute, rule or regulation or the
common law of any federal, state, or local
jurisdiction imposing liability in
connection with the offer, sale or purchase
of securities.

The Policy also contains a provision commonly referred to as an

"Insured vs. Insured Exclusion."  That exclusion states, subject to

certain exceptions: "This Policy does not apply to: . . . (E) any

Claim by or on behalf of, or in the name or right of, the Company or

any Insured Person . . . ."  Finally, as amended by endorsement, the

Policy also includes a "Shareholder Claims Exclusion" that provides,

in relevant part:

> [T]he Underwriter shall not be liable to make any
> payment for Loss in connection with any Claim .
> . . made against any Insured by or on behalf of,
> or in the name or right of, any past, present or
> future shareholder of the Company . . . who owns
> as of the date of the Claim, beneficially or in
> trust separately or in the aggregate, or did own,
> a 5% or more equity interest in the Company or
> any Subsidiary, whether such equity interest is
> in the form of common stock, preferred stock or
> other equity interest.  For the purposes of this
> endorsement, the term "shareholder" shall be
> deemed to include any member or other equity
> interest owner of a limited liability company.

## B.  The Underlying Actions

## 1.  The 2004 Action

On October 19, 2004, convinced that a former co-chief executive

officer of Kansas Heart Hospital was opening a competing medical

facility in violation of Cardiac Health's bylaws, Kansas Heart Hospital and Cardiac Health filed suit against Dr. Badr Idbeis in the District Court of Sedgwick County, Kansas (the "2004 Action"). The petition filed in the 2004 Action included causes of action for breach of fiduciary duty, tortious interference with prospective business opportunity, usurpation of opportunity belonging to Kansas Heart Hospital, and declaratory relief. The petition alleged that from "the inception of Kansas Heart Hospital in 1999 until February 2003, [Idbeis] was Chairman, Co-CEO and an active member of the Management Committee of [Kansas Heart Hospital]" and that from "the inception of [Kansas Heart Hospital] until October 18, 2004, [Idbeis] had a special relationship with [Kansas Heart Hospital]." The Petition also alleged that Idbeis breached his fiduciary duties to Kansas Heart Hospital by:

> Intentionally orchestrating the development of a competing health care facility known as Kansas Medical Center; . . . which facility is based in part on the defendant's knowledge of [Kansas Heart Hospital]'s confidential information, including the business model and practices, gained as a result of the special relationship with [Kansas Heart Hospital];

In the declaratory relief count of the petition, Cardiac Health alleged that Cardiac Health was a Kansas corporation that owned 39% of Kansas Heart Hospital and that Idbeis was a shareholder of Cardiac Health until October 18, 2004. Cardiac Health then asserted that Idbeis violated a Cardiac Health bylaw by "owning an interest in a competing health care facility" and, as a result, Cardiac Health had the right to redeem Idbeis' shares in Cardiac Health. As described by Cardiac Health's counsel, Cardiac Health's claim "really was a declaratory relief claim in the sense that the Court was asked to

-7-

bless the redemption of [Idbeis'] stock, which had already occurred in October of 2004."

On November 19, 2004, Idbeis filed an answer and counterclaim in the 2004 Action.  In his "counterclaim against [Cardiac Health]," Idbeis alleged: "[Cardiac Health]'s attempt to redeem Idbeis' stock is unauthorized and unlawful, and is in bad faith, and was done with the specific intent to injure and damage Idbeis, his reputation, and to benefit the interests of other individual health care providers."

On February 4, 2005, Kansas Heart Hospital and Cardiac Health filed a first amended petition in the 2004 Action which, among other things, added additional doctor defendants, including Drs. Ravi Bajaj, Gary S. Benton, Michelle Brown, Roger E. Evans, Assem Z. Farhat, Hussam Farhoud, Robert H. Fleming, Randee E. Lipman, Prakash J. Raghavan, G. Whitney Reader, John D. Rumisek, Donald L. Vine, and Lyle F. Zepick.  With respect to the additional defendants, the first amended petition alleged that "[p]rior to January 26, 2005, the remaining defendants were shareholders of Cardiac Health and Class A shareholders of Cardiac Associates."  After alleging that the additional defendants, like Idbeis, had violated Cardiac Health's bylaws by investing in a competing medical center, the first amended petition expanded the declaratory relief count and requested that the court declare that Cardiac Health "was authorized to redeem defendants' shares in Cardiac Health and that the redemption and amount tendered to the defendants was proper and in accordance with the Bylaws of Cardiac Health."

On March 17, 2005, Idbeis and some of the other newly-added defendants (Bajaj, Benton, Farhat, Farhoud, Fleming, Lipman, Raghavan,

-8-

Reader, Rumisek, and Vine) (the "Cardiac Physicians") filed their answer and counterclaims in response to the first amended petition. In support of their counterclaims against Kansas Heart Hospital and Cardiac Health ," the Cardiac Physicians alleged:

> 11. . . .Gregory F. Duick, M.D. ("Duick") is a director of [Cardiac Health] and a member of the [Kansas Heart Hospital] Management Committee, and that Duick improperly and unlawfully, and through a conspiracy or combination with other parties or entities, gained access to confidential, proprietary and trade secret information related to [the Kansas Medical Center] and the potential development of a general hospital, that is not in existence or operation, and which his [sic] not yet located anywhere.
>
> . . .
>
> 38. It is arbitrary, capricious and unreasonable for [Cardiac Health] to rely or act upon a determination by any other person or entity that [Kansas Medical Center], L.L.C. is a "competing health care facility" as defined in the above bylaw.
>
> . . .
>
> 44. [Cardiac Health]'s attempt to redeem Cardiac Physicians' stock is unauthorized and unlawful, and is in bad faith, and was done with a specific intent to injure and damage Cardiac Physicians, their reputations, and to benefit the interests of other individual health care providers.
>
> . . .
>
> 47. The directors of [Cardiac Health], the directors of [Kansas Heart Hospital], and the Management Committee of [Kansas Heart Hospital] have all breached their fiduciary duties of loyalty, good faith and due care toward Cardiac Physicians by, among other things, engaging in unfair self-dealing transactions, appropriating assets of [Kansas Heart Hospital] for their benefit to Cardiac Physicians' detriment, failing to exercise ordinary and due care in investigating the nature and purpose of [Kansas Medical Center], misappropriating to themselves personally, a substantial portion of the value of

-9-

Cardiac Physicians' [Cardiac Health] stock under the pretext that [Kansas Medical Center], L.L.C. is a competing health care facility located within 100 miles of Wichita, Kansas, and arbitrarily, capriciously and unreasonably making decisions against the best interests of the [Cardiac Health] shareholders.

48. The purported bylaw is unreasonable, anti-competitive, and unenforceable, in whole or in part, and as applied to Cardiac Physicians.

. . .

50. [Cardiac Health]'s redemptions of Cardiac Physicians' [Cardiac Health] stock are the ultra vires acts of the corporation, and law and equity demands that they be rescinded and that Cardiac Physicians' stock ownership be restored.

51. [Cardiac Health]'s improper redemption of Cardiac Physicians' [Cardiac Health] stock has improperly interfered with their rights and ability to practice at the Kansas Heart Hospital facility as an Active Member of its medical staff.

. . .

56. The actions of [Cardiac Health] and [Kansas Heart Hospital] have also caused Cardiac Physicians injury and damages in excess of $75,000.

Other doctor defendants named in the first amended petition responded with similar counterclaims. For example, Zepick alleged that the "Board of Directors' attempted redemption of Zepick's stock in Cardiac Health was improper and unlawful" and that the "Board of Directors breached its fiduciary duties to Zepick by improperly voting to redeem his stock in Cardiac Health." Zepick asserted various alleged wrongful acts in support of his claims for breach of fiduciary duty. Zepick claimed that the restrictive covenant in the bylaws was unlawful and legally unenforceable, and that the redemption was arbitrary, capricious, and in breach of fiduciary duties.

-10-

Furthermore, Zepick contended that the determination that Kansas Medical Center was a competing facility was wrongful, and that he was entitled to damages for an amount in excess of $75,000.

Another doctor defendant, Evans, alleged that it "was unlawful for Cardiac Health and Cardiac Associates to redeem Dr. Evans' stock; because such redemption was prohibited by Kansas law . . . ." Evans asserted various wrongful acts in support of his claims against Kansas Heart Hospital and Cardiac Health, including:

> 21. Among other things, the dispute between Dr. Duick and Dr. Idbeis arose because Dr. Idbeis had acted to oppose actions by Dr. Duick to benefit himself to the detriment of the shareholders of Cardiac Health, Cardiac Associates, and [Kansas Heart Hospital].
>
> . . .
>
> 24. Immediately prior to the annual meetings of Cardiac Health and Cardiac Associates on February 14, 2004, Dr. Duick and Dr. Steven Hutchinson, both directors of Cardiac Health, stated to Dr. Evans that they would not seek to invoke the redemption provisions of the Cardiac Health stock if Dr. Evans would cast the deciding vote in favor of the interests of Dr. Duick and adverse to the interests of Dr. Idbeis. Such action is a breach of Dr. Duick and Dr. Hutchinson's fiduciary duties as directors of the corporation.
>
> . . .
>
> 28. Beginning no later than February of 2003 and continuing to the present, Dr. Duick has exercised control over the policies and procedures of Cardiac Health, Cardiac Associates, and [Kansas Heart Hospital] for the benefit of himself and his partners and to the detriment of other physicians practicing at [Kansas Heart Hospital] to the extent that Dr. Duick and his partners have effectively appropriated the facilities of [Kansas Heart Hospital] to themselves, which is adverse to the best interest of the shareholders of [Kansas Heart Hospital], Cardiac Health and Cardiac Associates.

29. At all times subsequent to the shareholder vote so ordering, Dr. Duick and the other members of the board of directors of Cardiac Health have failed or refused to enlarge the board of directors from 4 members to 10 members in breach of their fiduciary duties.

30. Dr. Duick is the employer, partner, or substantial referring physician for a majority of the members of the Management Committee of [Kansas Heart Hospital], the board of directors of Cardiac Health, and the board of directors of Cardiac Associates. Dr. Duick's position allows him to exert economic pressure on said members to the extent that Dr. Duick is able to interfere, and has interfered, with those persons' independence and discretion in fulfilling their fiduciary duties of loyalty, good faith and due care toward Dr. Evans and the other stockholders of Cardiac Health, Cardiac Associates, and [Kansas Heart Hospital]. As a result of the undue control exerted by Dr. Duick, there is effectively only one member of the board of directors of Cardiac Health and of Cardiac Associates, that is, Dr. Duick.

31. On Saturday, February 14, 2004, Dr. Duick exercised undue influence over the management committee of [Kansas Heart Hospital], the board of directors of Cardiac Health, and the board of directors of Cardiac Associates to obtain resolutions to compel redemption of Dr. Evans' stock in Cardiac Health and Cardiac Associates in breach of Dr. Duick's fiduciary duties of loyalty, good faith and due care.

. . .

33. It was unlawful for Cardiac Health and Cardiac Associates to redeem Dr. Evans' stock; because such redemption was prohibited by Kansas law, namely the provisions of K.S.A. 2003 Supp. 17-6410(a)(3) and K.S.A. 2003 Supp. 17-6401(b).

. . .

55. The directors of Cardiac Health and Cardiac Associates, and the members of the management committee of [Kansas Heart Hospital] have breached their fiduciary duties of loyalty, good faith and due care with respect to the redemptions by failing to conduct a reasonable investigation as required to properly make their

-12-

findings and decisions relating to the redemptions and by arbitrarily and capriciously making findings and decisions against the best interests of the shareholders.

Brown also separately asserted various counterclaims and wrongful acts against Kansas Heart Hospital and Cardiac Health, including the following:

16. Cardiac Health bases its redemption on claims by Cardiac Health and [Kansas Heart Hospital] that Kansas Medical Center ("KMC") is a "competing health care facility" as defined in the bylaws of Cardiac Health. Such claims are arbitrary and capricious.

17. It is arbitrary and capricious, and unreasonable, for Cardiac Health to rely or act upon a determination by any other person that KMC is a competing health care facility.

. . .

23. By engaging in the redemption of Dr. Brown's stock and that of other physicians, the directors of Cardiac Health removed over half of the physicians practicing at Kansas Heart Hospital from being Active Members of the medical staff.

. . .

25. The directors of Cardiac Health, the directors of [Kansas Heart Hospital], and the management committee of [Kansas Heart Hospital] have breached their fiduciary duties of loyalty, good faith and due care towards Dr. Brown, among other things, by engaging in unfair selfdealing transactions, by appropriating the assets of [Kansas Heart Hospital] to their benefit and to her detriment, by failing to exercise due care in investigating the nature and purpose of Kansas Medical Center ("KMC"), by misappropriating to themselves a substantial portion of the value of Dr. Brown's stock under the pretext that {Kansas Medical Center} is a competing health care facility, and by arbitrarily and capriciously making decisions against the best interests of the shareholders.

Additionally, Brown claimed she was no longer able to practice at

-13-

Kansas Heart Hospital, and that she was entitled to damages in excess of $75,000 from Kansas Heart Hospital and Cardiac Health.

2.   The 2005 Action and Consolidation with the 2004 Action

On February 5, 2005, Cardiac Associates filed a new and separate petition in the Sedgwick County District Court captioned <u>Cardiac Associates of Wichita, Inc. v. Badr Idbeis, M.D., et al.,</u> Case No. 05 CV 0736, against the same individual doctors named in the first amended petition filed in the 2004 Action (the "2005 Action").  The petition in the 2005 Action alleged that Cardiac Associates held a 21% ownership interest in Kansas Heart Hospital, along with the 39% of Kansas Heart Hospital owned by Cardiac Health and the 40% of Kansas Heart Hospital owned by direct investors.  Similar to the relief sought in the first amended petition filed in the 2004 Action, the petition in the 2005 Action sought "a declaratory judgment that Cardiac Health was authorized to redeem defendants' shares in Cardiac Associates and that the redemption amount tendered to defendants was proper. . . ."

Counterclaims against Cardiac Associates by the Cardiac Physicians and the other individual defendants followed.  Each counterclaim alleged that Cardiac Associates had unlawfully redeemed the counter-claimant's stock and committed a breach of fiduciary duty by improperly voting to redeem the counter-claimant's Cardiac Associates stock.  In addition to claims for unauthorized redemption, the counter-claimants alleged wrongful interference with their right to participate in management; improper control over policies and procedures by Duick and others; misappropriation of the Kansas Heart Hospital facility; improper failure and refusal to enlarge the board

-14-

of directors from 4 to 10 members; improper exertion of economic pressure by members of the management committee of the Kansas Heart Hospital and the boards of Cardiac Health and Cardiac Associates; misrepresentations of authority; self-dealing by Duick and other directors of Cardiac Health and Cardiac Associates; improper and invalid determination that Kansas Medical Center was a competing facility; and breach of fiduciary duties of loyalty, good faith and due care by directors of Cardiac Health, Cardiac Associates, and the management committee of Kansas Heart Hospital.

On March 17, 2005, the Sedgwick County District Court consolidated the 2004 Action and the 2005 Action for purposes of discovery. On June 21, 2005, the court entered an order consolidating the cases for both discovery and trial (the "Consolidated Action"). On July 1, 2005, the Cardiac Physicians filed a motion to add party defendants in the Consolidated Action. Describing their prior counterclaims, the Cardiac Physicians asserted:

> 9. Cardiac Physicians each filed counterclaims alleging that the respective Board of Directors of Cardiac Associates and Cardiac Health breached their fiduciary duties to Cardiac Physicians by improperly redeeming their stock in violation of Kansas law and the Bylaws.

Based on those prior allegations, the Cardiac Physicians sought to add individual board members as third party defendants, including (a) Duick, Hutchinson, Milfeld and Reusser as members of the board of directors of Cardiac Health; and (b) Dakhil and Roberts as members of the board of directors of Cardiac Associates. The Cardiac Physicians alleged that "these individuals breached their fiduciary duties to Cardiac Physicians by improperly redeeming their stock in Cardiac

-15-

Health and Cardiac Associates."

On March 31, 2006, the Cardiac Physicians filed a third party petition against Duick, Hutchinson, Milfeld, and Ruesser alleging that the "directors of [Cardiac Health], the directors of [Kansas Heart Hospital], and the Management Committee of [Kansas Heart Hospital] have all breached their fiduciary duties of loyalty, good faith and due care" and that the "[Cardiac Health] Board of Directors, in collusion and conspiracy with others, and in breach of their fiduciary duties improperly approved the redemption" of the Cardiac Physicians' stock in Cardiac Health.   The third-party claims are based upon various alleged wrongful acts in addition to claims for improper redemption.   Zepick also filed a third-party petition.

In separate journal entries dated February 22, 2006 and May 25, 2006, the court in the Consolidated Action found the redemptions of stock by Cardiac Health and Cardiac Associates valid under their respective bylaws.   The court concluded as a matter of law that there can be no cause of action for breach of fiduciary duty against a corporate entity.   The court rejected the claim of breach of fiduciary duty for failing to fill a vacant board of director position.   In addition to finding that the bylaw provisions allowing redemption were authorized, the court found that the business judgment rule insulated the alleged wrongful acts of the corporate directors.   The court dismissed all claims for breach of fiduciary duty related to the alleged failure to fill vacant board positions.

3.   The Azmeh Action

On April 18, 2005, Dr. Wayel Azmeh filed a petition against Kansas Heart Hospital, Cardiac Health, and Cardiac Associates in the

-16-

Sedgwick County District Court captioned <u>Wayel Azmeh, MD v. Kansas Heart Hospital, LLC, et al.</u>, Case No. 05 CV 1577 (the "<u>Azmeh</u> petition"). Azmeh asserted that "[o]n or about February 26, 2004, Cardiac Health and Cardiac Associates improperly redeemed Dr. Azmeh's stock." In the single Count of the <u>Azmeh</u> petition, Azmeh alleges that the "purported redemptions of stock in Cardiac Health and stock of Cardiac Associates belonging to Dr. Azmeh are illegal being prohibited by K.S.A. 2003 Supp. 17-6410(a)(3) and are otherwise improper." The Sedgwick County District Court ultimately dismissed the <u>Azmeh</u> petition for lack of prosecution on September 26, 2005.

The wrongful acts alleged by Azmeh against Kansas Heart Hospital, Cardiac Health, and Cardiac Associates included improper exercise of control by Duick; improper failure and refusal to enlarge the board of directors from 4 to 10 members in breach of fiduciary duties; improper exertion of economic pressure on members of the management committee of the Kansas Heart Hospital and the boards of Cardiac Health and Cardiac Associates; intentional false statements by the directors; breach of fiduciary duties by failing to conduct a reasonable investigation and to properly make findings and decisions to support the redemptions. Azmeh further alleged that the redemption "was an intentional step in a series of willful and deliberate steps . . . ," and Azmeh sought damages as a result of the alleged improper redemptions and "the other improper acts" in an amount in excess of $75,000.

**C. The Parties' Dealings**

On March 31, 2005, Kansas Heart Hospital's broker, Lockton Companies ("Lockton"), faxed a General Liability Notice of

Occurrence/Claim Accord form to Executive Risk stating that "[Kansas Heart Hospital], Cardiac Health and Cardiac Assoc. have filed counter claims against the insured for breach of contract." On April 1, 2005, Chubb & Son, a division of Federal Insurance Company, which serves as claim manager for its affiliate, Executive Risk, wrote to Kansas Heart Hospital's chief financial officer, Smith, to "acknowledge receipt" of the submission. The claims examiner, Linda Quartermain, also advised Smith: "I will provide you with a written initial coverage analysis under the Policy as it relates to this case. In the interim, please understand that Executive Risk Indemnity Inc. ("ERII") must reserve all rights and defenses under the Policy and applicable law." By email dated April 1, 2005, Lockton forwarded various pleadings filed in the 2004 Action and the 2005 Action to Quartermain.

On April 5, 2005, Quartermain sent an email to Peterson, which stated, in part:

> [A]s I mentioned Chubb has issued a Duty to Defend policy to Kansas Heart and has accepted coverage subject to a reservation of right letter. As such, it is our obligation to defend the matter. As this is a counter claim and as Steve has the utmost confidence in you, I would like to gather some information from you [sic] have you approved as counsel. It would require Morris Laing separating out their bills as to the prosecution and defense of the claim, as Chubb will only pay for defense expenses. For example, any depositions should be split 50-50 between prosecution on [sic] defense. In addition, we have guidelines that we will audit the bills by and some substantive requirements.

On April 7, 2005, after discussing the matter with Peterson, (Kansas Heart Hospital's counsel) and Smith, Quartermain wrote Smith with Executive Risk's "preliminary coverage analysis." Prior to doing so, however, Quartermain stated that "these views are not intended to

-18-

be exhaustive or exclusive" and added "[w]e expressly reserve all of [Executive Risk's] rights under the Policy or otherwise, including, but not limited to, the right to raise additional policy terms and conditions as defenses to coverage when appropriate."  Quartermain also advised Smith that, although the Policy form included a duty to defend that permitted Executive Risk to select defense counsel in the event the Policy afforded coverage, Executive Risk would consider Kansas Heart Hospital's request that Executive Risk consent to Kansas Heart Hospital's current counsel, Peterson.  Quartermain's April 7, 2005, letter states, in part:

> The allegation against [Kansas Heart Hospital] appears to allege that the management Committee of [Kansas Heart Hospital] have conspired and combined to breach heir [sic] respective fiduciary duties of loyalty owed to Cardiac Physicians as shareholders.
>
> . . .
>
> As noted above, the Complaint makes numerous allegations against the Insured Entity.  The Policy covers Loss, if at all, which is in excess of the retention from Claims made against Insureds.  To the extent that Loss is based upon or attributable to Claims not covered under the Policy, a proper allocation of costs and expenses attributable to the covered and non-covered Claims must be made.
>
> . . .
>
> As part of and subject to the limit of liability stated in ITEM 3 of the Declarations, [Executive Risk] will have the right and duty to defend any claim as groundless, false or fraudulent. . . .
>
> . . .
>
> As we discussed, it is the obligation of [Executive Risk] to defend and thus select defense counsel.  I am in the process of getting information as to the retention of Ken Peterson of Morris Laing and will accept of [sic] deny his

-19-

> ability to defend these counter claims very
> shortly. Please also note that before [Executive
> Risk] would be in a position to consent to the
> incurring of Defense Expenses, we require the
> attorney to prepare a litigation plan and budget
> indicating their estimate of total Defense
> Expenses through the summary judgment and trial
> stages of this matter, as well as the rates to be
> charged by the attorneys and para-professionals
> that will be assigned to the matter.
>
> . . .
>
> For the aforementioned reasons, [Executive Risk]
> must reserve all of its rights and defenses under
> the Policy and applicable law. By doing so,
> [Executive Risk] is not denying coverage under
> the Policy. Rather, it is [Executive Risk]'s
> position that the allegations raised in the
> Complaint, if proven, may give rise to
> liabilities for which the Policy would not
> provide coverage.

The April 7, 2005, letter did not identify the Securities Exclusion
as a basis for denying coverage, but does identify other Policy
exclusions.

By email dated April 11, 2005, Quartermain advised Peterson that
Executive Risk "consented to the retention of [Peterson's firm] to
handle the defense of the claims only." Quartermain also asked
Peterson to complete a litigation budget and to comply with Executive
Risk's billing guidelines attached to the email. Quartermain advised
Peterson and Smith, in pertinent part:

> Chubb has consented to the retention of Morris
> Laing to handle the defense of these claims only.
> I will expect that Morris Laing shall submit
> bills to Chubb when submitting them to [Kansas
> Heart Hospital] and separate the defense from the
> prosecution. As agreed, any depositions or
> hearings mutually beneficial or integral to
> either side will be split in half and billed to
> each side. I have asked Morris Laing to complete
> the attached budget and return to me as quickly
> as possible as there is a very small $25,000
> deductible on the file. Once the Insured has

-20-

> paid the first $25,000 of defense bills, Chubb
> will then begin making payment.  None of the
> bills on the prosecutorial side will be credited
> towards the deductible.
>
> It is assumed that [Kansas Heart Hospital] will
> continue to pay all bills directly to the law
> firm and Chubb will reimburse [Kansas Heart
> Hospital] pursuant to our billing guidelines
> which are attached for your review.  I look
> forward to working with both of you and hope we
> can narrow our case following discovery at
> summary judgment and prepare for settlement and
> or [sic] trial.

On the same day, Quartermain expressly agreed to pay the fees of John Terry Moore of Moore Martin, L.C., Peterson's co-counsel, to assist in the defense.

On April 26, 2005, Peterson faxed a single-page chart to Quartermain with a proposed budget for the litigation.  Executive Risk required counsel for Kansas Heart Hospital, Cardiac Associates, and Cardiac Health to prepare a detailed budget, to review and follow detailed billing guidelines, and to specially segregate billable activity between defense and prosecution-related activity.  Peterson testified that it was difficult and time-consuming to comply with Executive Risk's conditions on the defense, and that he spent significant time doing so.

By email dated May 10, 2005, Peterson forwarded a copy of the Azmeh petition to Quartermain.  On May 13, 2005, Executive Risk wrote Smith to "acknowledge receipt" of the Azmeh petition.  Quartermain further advised Smith: "I will provide a written initial coverage analysis under the Policy as it relates to this case.  In the interim, please understand that Executive Risk Indemnity Inc. ("ERII") must reserve all rights and defenses under the Policy and applicable law."

-21-

Quartermain recommended setting an initial defense reserve for Executive Risk of $550,000.  In explaining why that reserve was not accepted and scheduled by underwriting, Quartermain testified:

> A.   After my initial investigation and my recommendation to post such a reserve, I had sent out a notification to the underwriting side of the company.  When someone from that side reviewed my large loss notification, I received a phone call, and generally, they wanted to know why the--doesn't the securities exclusion apply here and I would take another look at it.
>
> . . .
>
> A. I postponed the large loss--the posting of the defense reserve and I took the file and again reviewed it for coverage.  And I either spoke with Rich Falcigno or Chris Fagan about the securities exclusion.
>
> Q. What do you remember discussing with one or both of those individuals?
>
> A. Whether this applies.

On May 19, 2005, Quartermain wrote Smith to provide Executive Risk's "preliminary coverage analysis" regarding the Azmeh petition.  Again, Quartermain cautioned Smith that "these views are not intended to be exhaustive or exclusive" and added "[w]e expressly reserve all of [Executive Risk's] rights under the Policy or otherwise, including, but not limited to, the right to raise additional policy terms and conditions as defenses to coverage when appropriate."  Quartermain also advised Smith that, although the Policy form included a duty to defend that permitted Executive Risk to select defense counsel in the event the Policy afforded coverage, Executive Risk "has consented to the retention of Ken Peterson to handle this matter."

On May 24, 2005, Quartermain again wrote to Smith regarding the 2004 Action and the 2005 Action.  Quartermain first noted: "In

-22-

continuing my investigation into coverage, under the above-referenced Policy, I am following up with my letter dated April 7, 2005 in which I outlined a number of coverage provisions which potentially may be applicable." Next, after "expressly reserve[ing] all of [Executive Risk]'s rights under the policy," Quartermain identified the Shareholder Exclusion, the Securities Exclusion and the Insured vs. Insured Exclusion as policy provisions that may operate to preclude coverage.

Quartermain was responsible for determining Executive Risk's duty to defend, and because she initially believed the duty existed, she agreed to defend the insureds. Despite sending the May 24, 2005 letter stating broadly that the Securities Exclusion applied, Quartermain testified that she did not see the Securities Exclusion as applicable. Related to the Securities Exclusion, Quartermain acknowledged that the counterclaims alleged that none of the counter-claimants had ever owned an interest in Kansas Heart Hospital. Quartermain also acknowledged the existence of numerous alleged wrongful acts against the insureds in addition to the alleged wrongful redemption.

Quartermain admitted that her analysis of the Securities Exclusion was not accurate; that at least the first two sections of the Securities Exclusion had no application; and, that she did not research or investigate the application of the first two sections of the exclusion. Quartermain could not articulate how any of the claims alleged violation of a state statute that "imposes liability" for purposes of the exclusion. Quartermain admitted that she never checked the statutes that were cited by the underlying claimants to

-23-

determine whether or not they imposed liability. Quartermain confirmed that none of the underlying claimants had asserted a violation of any "Blue Sky" law, or any federal or state securities law.

At her deposition, Quartermain admitted that the term "Company" under the Executive Risk policy means Kansas Heart Hospital and not any other entity. Quartermain also testified that the Insured vs. Insured Exclusion had no application to claims advanced by present or former officers, directors, member managers of Cardiac Health or Cardiac Associates.

By letter dated June 23, 2005, Quartermain advised Smith that after further investigation, Executive Risk had determined that the Policy did not provide coverage for the Azmeh petition based, in part, on the Securities Exclusion. Quartermain invited Smith to submit any materials that Kansas Heart Hospital wanted Executive Risk to consider and to contact her with any questions. Quartermain also stated that "Executive Risk reserves all of its rights under the Policy or otherwise, including, but not limited to, the right to raise additional policy terms and defenses to coverage as other information becomes available."

On July 11, 2005, after receiving additional information from Smith regarding the structure of the entities and the positions held by certain counter-claimants, Quartermain wrote Smith regarding the 2004 Action and the 2005 Action. Quartermain advised Smith that, based on Executive Risk's investigation, Executive Risk had determined that the Policy did not provide coverage for either action based, in part, on the Insured vs. Insured Exclusion, the Shareholder Claims Exclusion, and the Securities Exclusion. Quartermain again invited

-24-

Smith to contact her with any questions and repeated that Executive Risk "expressly reserve[s] all rights under the Policy and available at law to disclaim on an additional or alternative basis, as other terms, conditions, exclusions, endorsements and provisions of the Policy are found to be applicable." Quartermain incorrectly stated in her July 11, 2005, letter to Smith that "it appears that [Cardiac Health] is the only defendant in the counterclaim brought in the district court. . . ." On September 2, 2005, counsel for Kansas Heart Hospital responded to Executive Risk's June 23, 2005 and July 11, 2005 correspondence.

In a September 22, 2005, email to counsel for plaintiffs, Quartermain stated that she had nothing in her file showing Kansas Heart Hospital as a defendant. Quartermain testified that if Kansas Heart Hospital was a party or a defendant, "then there would be no application" of the Co-Defendant Endorsement.

After denying coverage, Quartermain sent an email dated September 26, 2005, acknowledging that Executive Risk did "not have all the pleadings we need to analyze coverage." On October 5, 2005, after exchanging additional correspondence, Executive Risk reiterated its position that the Policy did not afford coverage for the underlying actions based on the grounds set forth in it prior correspondence, and again expressly reserved its rights under the Policy and available at law. The October 5, 2005 letter from Executive Risk de-emphasized the application of the Insured vs. Insured and Shareholder Exclusions and attempted to emphasize the application of the Securities Exclusion. Quartermain stated: "[p]rovided the entire Claim was not excluded as previously noted, an appropriate allocation would have to be made as

-25-

to which claims by which claimants were entitled to coverage under the Policy."

## D.   Corporate Structure

Until approximately February 2003, Idbeis and Duick served as co-chief executive officers of Kansas Heart Hospital. Idbeis has never owned any direct stock or membership interest in Kansas Heart Hospital. The only shares of stock Idbeis has ever owned were of Cardiac Associates and Cardiac Health. However, since October 18, 2004, Idbeis has owned no shares in Cardiac Health.

Out of 15 of the adverse claimants, only Idbeis, Reader, and Benton were former management committee members of Kansas Heart Hospital. None of the remaining 12 individual claimants had ever served as a director, officer, or member manager of Kansas Heart Hospital.

In 2004, Duick, Ashcom, Milfeld, Hutchinson, Hourani, Murfin, and Dakhil were members of the management committee of Kansas Heart Hospital. Therefore, individually named <u>defendants</u> in the underlying actions were directors, officers, or member managers of Kansas Heart Hospital.

## E.   State Court Resolution

On May 16, 2008, the Kansas Supreme Court issued an opinion in <u>Kansas Heart Hospital, L.L.C. v. Idbeis</u>, No. 97,131, 2008 WL 2065843 (Kan. May 16, 2008), <u>i.e.</u>, the consolidated, underlying action. The Kansas Supreme Court affirmed the lower court's grant of partial summary judgment for the defendants in the underlying actions, which disposed of the individual physicians' counter-claims. <u>See also</u> Docs. 49 (plaintiffs' notice of supplemental authority), 51 (defendant's

responsive filing).

### III.   SUMMARY JUDGMENT STANDARDS

The rules applicable to the resolution of this case, now at the summary judgment stage, are well-known and are only briefly outlined here.  Federal Rule of Civil Procedure 56(c) directs the entry of summary judgment in favor of a party who "show[s] that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if sufficient evidence exists "so that a rational trier of fact could resolve the issue either way" and "[a]n issue is 'material' if under the substantive law it is essential to the proper disposition of the claim." Adler v. Wal-Mart Stores, Inc., 144 F.3d 664, 670 (10th Cir. 1998).  When confronted with a fully briefed motion for summary judgment, the court must ultimately determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250 (1986).  If so, the court cannot grant summary judgment. Prenalta Corp. v. Colo. Interstate Gas Co., 944 F.2d 677, 684 (10th Cir. 1991).

Even though the parties have filed cross-motions for summary judgment, the legal standard does not change. See United Wats, Inc. v. Cincinnati Ins. Co., 971 F. Supp. 1375, 1382 (D. Kan. 1997).  It remains this court's sole objective to discern whether there are any disputes of material fact, see Harrison W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir. 1981), and the court will treat each motion

-27-

separately.  See Atl. Richfield Co. v. Farm Credit Bank of Wichita,
226 F.3d 1138, 1148 (10th Cir. 2000).  Where the parties file cross
motions for summary judgment, the court is entitled to assume that no
evidence needs to be considered other than that filed by the parties.
However, summary judgment is nevertheless inappropriate if disputes
remain as to material facts.  James Barlow Family Ltd. P'ship v. David
M. Munson, Inc., 132 F.3d 1316, 1319 (10th Cir. 1997) (citing Harrison
W. Corp. v. Gulf Oil Co., 662 F.2d 690, 692 (10th Cir.1981)).

**IV.  ANALYSIS**

At base, this case deals with the interpretation of an insurance
policy.  "As a general rule, the interpretation or construction and
meaning and legal effect of written instruments are matters of law
exclusively for the court and not questions of fact for determination
by the jury."[1]  First Fin. Ins. Co. v. Bugg, 265 Kan. 690, 694, 962
P.2d 515, 519 (Kan. 1998).  When interpreting an insurance policy,
Kansas courts should be guided by the following:

> Policies must be construed according to the sense
> and meaning of the terms used, and if the
> language is clear and unambiguous, it must be
> taken in its plain, ordinary, and popular sense.
> Similarly, courts should not strain to create an
> ambiguity where, in common sense, there is none.

---

[1]  This is a diversity action brought pursuant to 28 U.S.C. §
1332.  As such, the substantive law of the forum state, including that
forum state's choice of law rules, applies.  See, e.g., Klaxon Co. v.
Stentor Elec. Mfg. Co., 313 U.S. 487, 496 (1941) (holding that in a
diversity action, the federal court must use the forum's conflict of
laws rules to determine the law to be applied in a breach of contract
action).

Kansas is the forum state and Kansas' choice of law rules in
contract-based actions mandate the lex loci contractus principle,
wherein the law where the contract is made governs the action.  Safeco
Ins. Co. of Am. v. Allen, 262 Kan. 811, 822, 941 P.2d 1365, 1372 (Kan.
1997).  Executive Risk issued the Policy to Kansas Heart Hospital in
Kansas, and Kansas' law will be applied.

> The test to determine whether an insurance contract is ambiguous is not what the insurer intends the language to mean, but what a reasonably prudent insured would understand the language to mean.

Id. (internal citations omitted).  In addition, a court "must consider the terms of an insurance policy as a whole, without fragmenting the various provisions and endorsements."  Marshall v. Kan. Med. Mut. Ins. Co., 276 Kan. 97, 111, 73 P.3d 120, 130 (Kan. 2003).

There is no dispute in the summary judgment motions that the Policy's "duty to defend" coverage term applies.  Regarding an insurer's duty to defend, the Tenth Circuit, applying Kansas law, has stated:

> Under Kansas law, an insurer's duty to defend arises whenever there is a 'potential of liability' under the policy.  The insurer must determine whether there is a potential of liability under the policy by examining the allegations of the complaint as well as any additional facts that have been brought to its attention.  The relevant determination for the insurer is whether there is a possibility that under the facts of the case the insured may be found legally obligated to pay damages because of an occurrence that was an insured risk; that is, a possibility that there may be a duty to indemnify arising out of the facts of the case.

> The duty to indemnify is narrower than the duty to defend.  Although the duty to defend is determined by the allegations of the underlying complaint and by facts discoverable to the insurer, the duty to indemnify is determined by the facts as they are established at trial or as they are finally determined by some other means (e.g., summary judgment or settlement).

> With regard to the insurer's duty to defend and to indemnify, when the terms are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.  The fact that judicial opinions have interpreted identical policy provisions differently may demonstrate

-29-

> ambiguity.  However, when an insurance contract
> is not ambiguous, the court may not make another
> contract for the parties.  Its function is to
> enforce the contract as made.

Bankwest v. Fid. & Deposit Co. of Maryland, 63 F.3d 974, 978-79 (10th

Cir. 1995) (internal quotations and citations omitted).[2]

Executive Risk contends, however, that three separate and

distinct exclusions apply, thereby justifying its determination that

there was no "potential for its liability" under the Policy.

Regarding exclusions in insurance policies, the insurer has the burden

to establish the applicability of the exclusion.  First Fin. Ins. Co.,

265 Kan. at 696, 962 P.2d at 521 ("[I]nasmuch as the insurer prepares

the policy, the burden is upon him to establish facts which the bring

the case within the exceptions set forth in the policy.").

"As a general rule, exceptions, limitations, and exclusions to

insurance policies are narrowly construed.  The insurer assumes the

duty to define limitations to an insured's coverage in clear and

explicit terms."  Marshall, 276 Kan. at 112, 73 P.3d at 130; see also

Associated Wholesale Grocers, Inc. v. Americold Corp., 261 Kan. 806,

---

[2] See also Spivey v. Safeco Ins. Co., 254 Kan. 237, 245-46, 865
P.2d 182, 188 (Kan. 1993) ("The duty to defend rests primarily on the
possibility that coverage exists, and the possibility of coverage must
be determined by a good faith analysis of all information the insurer
may know or could have reasonably ascertained.  If ambiguities in
coverage, including exclusionary clauses, are judicially determined
against the insurer, the ultimate result controls the insurer's duty
to defend. . . . The insurer determines if there is a potential of
liability under the policy by examining the allegations in the
complaint or petition and considering any facts brought to its
attention or which it could reasonably discover.  Where a petition
alleges an act that is clearly not covered, . . . there would be no
potential of liability under the policy. . . . Where the complaint
alleges both a [covered act] and [non-covered] act, these alleged
facts give rise to the potential for liability, and the duty to defend
arises.").

824, 934 P.2d 65, 78 (Kan. 1997) (stating same).  "If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured."  Catholic Diocese of Dodge City v. Raymer, 251 Kan. 689, 693, 840 P.2d 456, 459 (Kan. 1992).  See also Farm Bureau Mut. Ins. Co. v. Old Hickory Cas. Ins. Co., 248 Kan. 657, 659, 810 P.2d 283, 286 (Kan. 1991) ("The language of a policy of insurance, like any other contract, must, if possible, be construed in such manner as to give effect to the intention of the parties.  Where the terms of a policy of insurance are ambiguous or uncertain, conflicting, or susceptible of more than one construction, the construction most favorable to the insured must prevail.  Since the insurer prepares its own contracts, it has a duty to make the meaning clear.  If the insurer intends to restrict or limit coverage provided in the policy, it must use clear and unambiguous language in doing so; otherwise, the policy will be liberally construed in favor of the insured."); United States Auto. Ass'n v. Morgan, 23 Kan. App. 2d 987, 992, 939 P.2d 959, 963 (Kan. Ct. App. 1997) (stating that in construing exclusions, courts "are required to employ a narrow construction on the theory that the insurer, having affirmatively expressed coverage through broad promises, assumes a duty to define any limitations on that coverage in clear and explicit terms."(internal quotation omitted)).

## A.  Securities Exclusion

The first exclusion relied upon by Executive Risk is the Securities Exclusion, which provides, in pertinent part:

In consideration of the premium charged, no

coverage will be available under this Policy for
Loss, including Defense Expenses, resulting from
any Claim based on, arising out of, directly or
indirectly resulting from, in consequence of, or
in any way involving any actual or alleged
violation of:

> (1) the Securities Act of 1933, the
> Securities Exchange Act of 1934, the
> Investment Company Act of 1940, any other
> federal law with respect to the regulation
> of securities, any rules or regulations of
> the United States Securities and Exchange
> Commission, or any amendment of any such
> law, rule or regulation; or

> (2) any state securities or "Blue Sky" laws
> or rules or regulations, or any amendment of
> any such laws, rules or regulations; or

> (3) any provision of any federal, state, or
> local statute, rule or regulation or the
> common law of any federal, state, or local
> jurisdiction imposing liability in
> connection with the offer, sale or purchase
> of securities.

Executive Risk contends that the Securities Exclusion's third
subsection is applicable, and precludes coverage for the underlying
actions. Executive Risk's argument is as follows: 1) because the
"origin" for each of the underlying actions was the decision by
Cardiac Health and Cardiac Associates to redeem stock, and the
counter-claimants' actions challenged the ability of Cardiac Health
to do so, as well of a breach of fiduciary duty for doing so; then 2)
the counter-claims fall within the language of the Securities
Exclusion, which excludes a duty to defend "any Claim based on,
arising out of, directly or indirectly resulting from, in consequence
of, or in any way involving" "any provision of any federal, state, or
local statute, rule or regulation or the common law of any federal
state, or local jurisdiction imposing liability in connection with the

-32-

offer, sale or purchase of securities." (Doc. 36 at 16-18.)

Plaintiffs first respond that the third subsection of the Securities Exclusion is ambiguous and should be construed, based on the reading of the two subsections preceding it, to exclude only violations of specific provisions of federal, state, or local statutes, rules, regulations or common law that expressly impose liability for securities violations. Plaintiffs then argue that the underlying actions do not include securities claims and that, therefore, the Securities Exclusion is not applicable. Plaintiffs also contend that because Kansas Heart Hospital is not an entity that even issued stock, the Securities Exclusion cannot possibly have any applicability to claims against its officers and members. (Doc. 42 at 20-23.)

First, the court finds that the Securities Exclusion is not ambiguous. A reasonably prudent insured would understand the exclusion - the exclusion's express terms include no language that is questionable in meaning or applicability. First Fin. Ins. Co. v. Bugg, 265 Kan. 690, 694, 962 P.2d 515, 519 (Kan. 1998). For the Securities Exclusion to apply, three "clauses" must be met: 1) any "Claim"; 2) "based on, arising out of, directly or indirectly resulting from, in consequence of, or in any way involving an actual or alleged violation of"; and 3) "any provision of any federal, state, or local statute, rule or regulation or the common law of any federal, state, or local jurisdiction imposing liability in connection with the offer, sale or purchase of securities."

Second, and because the Securities Exclusion is not ambiguous, the court finds that the exclusion is not applicable. A claim for

-33-

breach of corporate bylaws, and for breach of fiduciary duty is not an "alleged violation of" a <u>law</u>, be it statute, rule, regulation, or common law, that imposes liability in connection with securities.[3] The counterclaims allege violations of bylaws and fiduciary duties, not violations of securities laws.  The end result of the alleged violations of bylaws and fiduciary duties was that shares were redeemed out of compliance with those bylaws and fiduciary duties, but that does not mean that the action itself was a claim for a violation of a securities law or any other law.

Executive Risk also cites three cases it contends demonstrate the applicability of the Securities Exclusion in this case.  <u>See</u> <u>Bendis v. Fed. Ins. Co.</u>, No. 89-2035-S, 1989 WL 161437 (D. Kan. Dec. 4, 1989); <u>Isroff v. Fed. Ins. Co.</u>, No. 93-3130, 1994 WL 253027 (6th Cir. June 8, 1994); <u>Nat'l Rest.s Mgmt., Inc. v. Executive Risk Indem., Inc.</u>, 304 A.D.2d 387 (N.Y. App. Div. 2003).  The court is not persuaded by these cases, however.

---

[3]    Plaintiffs argue that the court should construe the third subpart of the Securities Exclusion so that it applies only to violations of laws that expressly impose liability for securities violations.  <u>See</u> <u>Keller v. Ely</u>, 192 Kan. 698, 701, 391 P.2d 132, 135 (Kan. 1964) ("Briefly stated, [the rule <u>ejusdem generis</u>] is a well-known maxim of construction to aid in ascertaining the meaning of a statute or other instrument, the doctrine being that where an enumeration of specific things is followed by some more general word or phrase, such general word or phrase is to be held to refer to things of the same kind with respect to a classification which immediately precedes it-that is to say, where general words follow particular words in an enumeration describing the subject matter, general words are construed to embrace only objects similar in nature to those enumerated by antecedent specific words.").
    The court finds construction of the Securities Exclusion not necessary, because the court finds that it unambiguously applies only to alleged violations of statutes, rules, regulations, or provisions of the common law that impose liability in connection with the transfer of securities.

In <u>Bendis</u>, plaintiffs, who were former officers and/or directors of a corporation holding a directors and officers liability insurance policy, sought indemnification from the defendant insurance policy. The policy in issue excluded coverage for "any claim(s)" brought by an "insured person." The policy defined insured person as "any person who has been, now is, or shall become a duly elected director, or a duly elected or appointed officer of the Insured Organization." The first suit plaintiffs sought coverage for was an employment dispute from a former vice president of the insured organization, Bridgmon. The court found that it was undisputed that Bridgmon was a vice president, and a "duly elected and appointed officer." Bridgmon therefore qualified as an insured person, and the Insured vs. Insured exclusion unambiguously excluded his suit from coverage. The court also found that Bridgmon's suit would have also been excluded by the policy's language excluding "any" claims made by former shareholders, <u>i.e.</u>, a shareholder exclusion. <u>Bendis</u>, 1989 WL 161437 at *2-3.

The second suit in <u>Bendis</u> that the plaintiffs sought indemnification for was "based on allegations concerning alleged fraud under the federal securities laws, common law fraud, negligence, and negligent misrepresentations by defendants in connection with the purchase" of a corporate entity. The policy contained a securities exclusion, which excluded from coverage "any claim(s) made against any Insured Person(s)" "where all or part of such claim is, directly or indirectly, based on, . . . or in any manner related to any actual or alleged violation of . . . any law relating to securities transactions." The court found that it was undisputed that nine of the eleven claims brought by the plaintiffs in the underlying action

-35-

fell under the securities exclusion, because they all involved alleged violations of securities laws.  The court also found the remaining two counts, both common law tort claims, were excluded by the securities exclusion, because they were "based upon the same factual allegations which form the basis for the alleged violations of securities laws stated in the other counts."  Id. at *2, *4.

Unlike in Bendis, however, here none of the underlying claims allege violations of securities laws.  The underlying claims here solely allege Cardiac Health's breach of its bylaws, and then breach of fiduciary duty because of that alleged breach of bylaws.  It is true that the result of the alleged breach was the redemption of the individual physicians' stock, but securities are not the source of the counter-claims.  Rather, breach of a bylaw is.  If the individual physicians had alleged a securities violation, and alleged breach of bylaws, then the court's holding in Bendis would be factually applicable.  Similarly, the other cases cited by Executive Risk involve situations where the underlying actions, at least partially, include claims that have their origins in actual securities law violations.  See Nat'l Rests. Mgmt., Inc., 304 A.D.2d at 387 (finding that a securities exclusion applied to exclude coverage for a claim "brought by shareholders in plaintiff corporation and alleg[ing] that plaintiffs participated in a scheme to secure the shareholders stock for little or no consideration and convey it to plaintiff president"); Isroff, 25 F.3d at *2 (finding that a securities exclusion applied to exclude coverage for a fiduciary duty claim because that claim was related to an alleged violation of the Securities Exchange Act "because it posed an alternate theory for recovery based on the

alleged withholding of information material to the [sale of stock from a shareholder back to the corporation]").

As a result, the court finds that the Securities Exclusion is not applicable, and Executive Risk may not rely on this exclusion to avoid its express duty to defend under the Policy.

**B.  Insured vs. Insured Exclusion**

The Policy's Insured vs. Insured Exclusion states that: "This Policy does not apply to: . . . (E) any Claim by or on behalf of, or in the name or right of, the Company or any Insured Person . . . ." The Policy defines Insured Person as "any past, present or future director, officer or member manager of the Company" and Company is defined as "the Parent Corporation [Kansas Heart Hospital] and any Subsidiary."

The Policy defines Claims as "written notice received by an Insured that any person or entity intends to hold any Insured responsible for a Wrongful Act."  Wrongful Act is defined as:

> (1) any Employment Practices Wrongful Act by an Insured Person in his or her capacity as a director, officer, member manager or employee of the Company;
>
> (2) any other actual or alleged act, error, omission, misstatement, misleading statement or breach of duty by an Insured Person in his or her capacity as a director, officer or member manager of the Company;
>
> (3) any matter asserted against an Insured Person solely by reason of his or her status as a director, officer or member manager of the Company; and
>
> (4) any Employment Practices Wrongful Act by the Company or any other actual or alleged error, omission, misstatement, misleading statement or breach of duty by the Company; provided, that this DEFINITION (Q)(4) will only apply if it is

-37-

> stated in the Declarations that coverage has been
> made available under INSURING AGREEMENT (B)(2).

The Policy's Conditions section discusses the treatment of "Related Claims." It states:

> IV. CONDITIONS
>
> . . .
>
> (G) Notice; Timing and Interrelationship of Claims:
>
> . . .
>
>> (4) All Related Claims will be treated as a single Claim made when the earliest of such Related Claims was first made, or when the earliest of such Related Claims is treated as having been made in accordance with CONDITION (G)(2), whichever is earlier.

Executive Risk argues that the Insured vs. Insured Exclusion applies because several of the claimants in the underlying actions were Insured Persons, and the consolidated actions and the <u>Azmeh</u> petition should be treated as a Related Claim. Executive Risk contends that the Policy does not require that <u>all</u> claimants be Insured Persons. (Doc. 36 at 21-22.)

Plaintiffs respond that the Insured vs. Insured Exclusion does not apply to claimants who are not Insured Persons, and that the Related Claims language from the Policy only deals with requirements for giving notice and is not an exclusionary term. Plaintiffs then contend that Kansas law requires that where an insurer has a duty to defend some of the claims in an action, they must defend the entire action. Finally, plaintiffs contend that the Insured vs. Insured Exclusion is not applicable because the "purpose" of the exclusion has not been triggered. (Doc. 42 at 24-26.)

-38-

The Seventh Circuit has described the "purpose" of the Insured vs. Insured exclusion.  As stated by that circuit, the exclusion's purpose is:

> to exclude coverage both of collusive suits—such as suits in which a corporation sues its officers or directors in an effort to recoup the consequences of their business mistakes, thus turning liability insurance into business-loss insurance—and of suits arising out of those particularly bitter disputes that erupt when members of a corporate, as of a personal, family have a falling out and fall to quarreling.

Level 3 Commc'ns, Inc. v. Fed. Ins. Co., 168 F.3d 956, 958 (7th Cir. 1999).  Plaintiffs then argue that because there is no "evidence or suggestion of a collusive lawsuit," and because the claims are not asserted in the capacity of a former managing member, the "purpose of the exclusion is not implicated."

However, in Kansas, it is not the "purpose" of an exclusion in an insurance contract that controls; rather, it is the plain meaning of the language of the contract that is determinative.  See First Fin. Ins. Co. v. Bugg, 265 Kan. 690, 694, 962 P.2d 515, 519 (Kan. 1998) ("Policies must be construed according to the sense and meaning of the terms used, and if the language is clear and unambiguous, it must be taken in its plain, ordinary, and popular sense.").

The plain language of the Insured vs. Insured Exclusion applies to "any Claim by or on behalf of, or in the name or right of, the Company or any Insured Person."  An Insured Person is "any past, present or future director, officer or member manager" of Kansas Heart Hospital.  Executive Risk contends Idbeis is an Insured Person because Smith testified that it was correct that Idbeis was "at one time[] an officer of the Kansas Heart Hospital."  Executive Risk then contends

-39-

that Reader and Benton are Insured Persons because Smith testified that it was correct that Reader and Benton "by virtue of being member managers of KHH at one time . . . that they were also insured persons."  Plaintiffs admit that Idbeis, Reader, and Benton are Insured Persons under the Policy.

Seemingly then, there could be no dispute that the Insured vs. Insured Exclusion applies to Idbeis, Reader, and Benton's claims. Executive Risk is not satisfied with this partial victory, and argues that the Policy's "Related Claims" language applies and therefore excludes coverage for its duty to defend <u>all</u> the counterclaims. [4]

Plaintiffs dispute that the Related Claims language applies. They argue that it is found not amongst the Policy's exclusions, or even its definitions, but only in the portion of the Policy dealing with the requirements of giving notice of wrongful acts or claims under the Policy for the purpose of determining what policy period applies.

Clearly, the counter-claims in the underlying actions are related claims.  A related claim is any claim based on, "or in any way involving the same or related facts, circumstances, situations,

---

[4]    Executive Risk also attempts to argue that because the exclusion bars "any Claims" from "<u>any</u> Insured Persons," that <u>all</u> claims should be excluded, regardless of whether that claims is from an insured person.  (Doc. 36 at 22.)  The cases Executive Risk cites in support of this argument, that one insured person's claim excludes all persons claim, are wholly inapplicable.  <u>See PowerSports, Inc. v. Royal & Sunalliance Ins. Co.</u>, 307, F. Supp. 2d 1355, 1359-60 (S.D. Fla. 2004) (applying an insured vs. insured exclusion to all claims because the insured person was a party to <u>each</u> claim asserted in the underlying suit); <u>Sphinx Int'l, Inc. v. Nat'l Union Fire Ins. Co.</u>, 226 F. Supp. 2d 1326, 1337 (M.D. Fla. 2002) (applying an exclusion "for claims brought by security holders at the instigation of, or with the assistance or participation of, a director or officer," <u>i.e.</u>, an insured person; not simply because one insured person was involved).

transactions or events."  However, related claims are only treated as a single claim for the purpose of giving notice of claims, not for all purposes, and certainly no mention of this is made in the Policy's exclusions section.  The express terms of the Policy, when read as a whole, give no support to Executive Risk's contention that all the counter-claims should be excluded under the Insured vs. Insured Exclusion.

As a result, the court rejects Executive Risk's contention that the exclusion relieves it from its contractual duty to defend all the underlying action's counter-claims.  This time, however, plaintiffs are not satisfied.  They argue that the counter-claims made by Idbeis, Reader, and Benton should also not be excluded from coverage. Plaintiffs contend that Kansas law prohibits the division of the counter-claims in this manner.

The Kansas Supreme Court has agreed with decisions holding that "where an action of an injured person is based upon various grounds which are not within the terms of the policy, and on another which is within its terms, the situation does not justify an insurance company in declining to defend." Leonard v. Maryland, 158 Kan. 263, 265, 146 P.2d 378, 381 (1944), overruled on other grounds, Spruill Motors, Inc. v. Universal Underwriters Ins. Co., 212 Kan. 681, 512 P.2d 403 (Kan. 1973).  This is not the case here, however.  The counter-claims in the underlying actions were brought by individual physicians, and it is the entirety of Idbeis, Reader, and Benton's counter-claims that are excluded.  The court is not finding that some of these doctors claims are excluded while some are included.  Rather, the court finds that Executive Risk, under its insurance contract with plaintiffs, had no

-41-

duty to defend the counter-claims brought by Idbeis, Reader, and Benton, based on the express language of the Insured vs. Insured exclusion.

How the parties could, or should, have handled the division of the defense of these claims is not before the court.

## C.  Shareholder Exclusion

The Policy's Shareholder Exclusion provides, in relevant part:

> [T]he Underwriter shall not be liable to make any payment for Loss in connection with any Claim . . . made against any Insured by or on behalf of, or in the name or right of, any past, present or future shareholder of the Company . . . who owns as of the date of the Claim, beneficially or in trust separately or in the aggregate, or did own, a 5% or more equity interest in the Company or any Subsidiary, whether such equity interest is in the form of common stock, preferred stock or other equity interest.  For the purposes of this endorsement, the term "shareholder" shall be deemed to include any member or other equity interest owner of a limited liability company.

Executive Risk argues that the Shareholder Exclusion applies because of Idbeis' "indirect equity interest" held "at one time in [Kansas Heart Hospital]."  Executive Risk then makes the same arguments made in support of the application of the Insured vs. Insured Exclusion's applicability: that the exclusion of Idbeis' claim causes all the claims to qualify for exclusion.  (Doc. 36 at 23-24.)

Plaintiffs respond that Executive Risk's position is "fatally flawed."  Plaintiffs first contend that Idbeis does not own, and never has owned, a five percent or more equity interest in Kansas Heart Hospital that would trigger the exclusion, and state that Idbeis owned stock only in Cardiac Health and Cardiac Associates which are not the Company under the Policy.  Plaintiffs then make their same arguments

-42-

in response to Executive Risk's same contentions.  Finally, plaintiffs argue that the Shareholder Exclusion is not applicable because even if Idbeis' stock ownership in Cardiac Health and Cardiac Associates was considered, he did not own that interest as of the date of the claim, a requirement for applicability of the exclusion.  (Doc. 42 at 26-27.)

Because of the court's determinations regarding application of the Insured vs. Insured Exclusion, analysis of the Shareholder Exclusion is not necessary.  The court has already determined that Idbeis' counter-claims were excluded from Executive Risk's duty to defend.  The court has also concluded that this exclusion does not apply to the other counter-claims simply because they are related claims.  Therefore, regardless of whether Idbeis was a shareholder, Executive Risk had no duty to defend against his counter-claims, and the question of the application of the Shareholder Exclusion to Idbeis' counter-claim is moot.

**D.  Estoppel**

Executive Risk anticipates that plaintiffs will respond to its summary judgment motion by arguing that the theory of estoppel precludes Executive Risk from arguing its Policy's exclusion, because Executive Risk initially accepted defense of the counter-claims in the underlying actions.  Plaintiffs do not respond and do not argue estoppel in their motion.

> 'If a liability insurer, with knowledge of a
> ground of forfeiture or noncoverage under the
> policy, assumes and conducts the defense of an
> action brought against the insured, without
> disclaiming liability and giving notice of its
> reservation of rights, it is thereafter precluded
> in an action upon the policy from setting up such

> ground of forfeiture or noncoverage. The
> insurer's conduct in this respect operates as an
> estoppel to later contest an action upon the
> policy, regardless of the fact that there has
> been no misrepresentation or concealment of
> material facts on its part, and notwithstanding
> the facts may have been within the knowledge of
> the insured equally as well as within the
> knowledge of the insurer.'

Golf Course Superintendents Ass'n of Am. v. Underwriters at Lloyd's, London, 761 F. Supp. 1485, 1492 (D. Kan. 1991) (quoting Snedker v. Derby Oil Co., 164 Kan. 640, 192 P.2d 135, 137 (1948)).  The Golf Course case also stated: "In other words, the rule prevents an insurance company from taking over the defense of a matter but avoiding the coverage of the end result, without an adequate reservation and warning to the insured.  That way, the insured can make its own decision regarding the need for independent defense counsel."  Id.  To prove an estoppel claim, the proponent must also show prejudice.  Glenn v. State Farm Mut. Auto. Ins. Co., 341 F.2d 5, 7 (10th Cir. 1995).

Plaintiffs have not met their burden to show that there was no disclaimer of liability, no notice of Executive Risk's reservation of rights, or that they were prejudiced by Executive Risk's behavior. They have not argued estoppel at all.  Plaintiffs' estoppel claim, if indeed they are still pursuing one, is deemed abandoned.

**E.  Attorneys' Fees**

Executive Risk moves for summary judgment on the plaintiffs' claim for attorneys fees.  (Doc. 36 at 26-28.)  Plaintiffs seek attorneys fees under K.S.A. § 40-256, which states:

> [I]f it appear from the evidence that such
> company, society or exchange has refused without
> just cause or excuse to pay the full amount of

> such loss, the court in rendering such judgment
> shall allow the plaintiff a reasonable sum as an
> attorney's fee for services in such action,
> including proceeding upon appeal, to be recovered
> and collected as a part of the costs.

Executive Risk alleges that plaintiffs can point to no facts that Executive Risk "refused without just cause" to pay for plaintiffs' defense, and that, therefore, it is entitled to summary judgment on this claim. Plaintiffs contend that a fact issue remains regarding whether Executive Risk's denial of coverage was made in bad faith. Plaintiffs point to:

> 1) Executive Risk's initial commitment to pay and then change of course after learning of the high defense budget;
>
> 2) Executive Risk's claims investigator's initial belief that the Securities Exclusion relied upon by Executive Risk to exclude coverage, was not applicable;
>
> 3) Executive Risk's failure to consider the various "Wrongful Acts" that made up the claims against plaintiffs;
>
> 4) Executive Risk's misrepresentation that it did not show Kansas Heart Hospital as a defendant in the counter-claims in the underlying actions;
>
> 5) the admission by Executive Risk that it denied coverage without reviewing all pleadings necessary to determine its duty to defend;
>
> 6) the claims reviewer's admission that she did not check the statute listed in the Securities Exclusion to determine whether they applied; and
>
> 7) Executive Risk required a tome-consuming separation of litigation expenses, and agreed to pay for defense under those requirements, yet failed to pay for expenses even up to its denial.

(Doc. 42 at 28-30.)

Whether an insurance company's refusal to pay a claim was without just cause or excuse is a question of fact. If an insurance company's refusal is a frivolous and unfounded denial of liability that is

-45-

patently without any reasonable foundation, it is without just cause or excuse.  See Pac. Employers Ins. v. P.B. Hoidale Co., 804 F. Supp. 137, 144 (D. Kan. 1992) (writing that "[t]he phrase 'without just cause or excuse' means a frivolous and unfounded denial of liability for which there is no bona fide and reasonable ground for refusing to pay").  However, if a good faith legal controversy exists as to liability, section 40-256 fees must be denied.  Fees also must be denied if there is a bona fide and reasonable factual ground for refusing to pay the claim.  Thus, a denial of payment that is not arbitrary, capricious, or in bad faith will not give rise to an award of attorney fees.  City of Salina v. Maryland Cas. Co., 856 F. Supp. 1467, 1481 (D. Kan. 1994) (internal quotations and citations omitted).

A determination of whether an action by an insurer is "arbitrary, capricious, or in bad faith" is fact intensive.  The facts here show that Executive Risk initially believed exclusions in the Policy did not apply, required plaintiffs' counsel to incorporate its reimbursement guidelines, agreed to pay defense costs, and only upon review by more of its members, changed its determination.  However, there is a fact issue whether Executive Risk made this second determination in bad faith, because the individual making the determination did not check applicable statutes pertinent to the exclusions, and because it did so while not even knowing the named defendants in the cross-claims of the underlying actions, and without a full record for review.  In addition, the record is clear that Executive Risk only changed course upon learning of the high defense reserve, a fact that implies Executive Risk was then looking for ways out of the Policy's duty to defend.  Executive Risk did consistently

-46-

warn plaintiffs that its initial determination was subject to a determination that a coverage exclusion applied, but this fact alone does not trump the previous facts mentioned.

Executive Risk's motion for summary judgment on plaintiffs' claim for attorneys fees under K.S.A. § 40-256 is denied. A fact-intensive determination must be made by the trier of fact whether Executive Risk "refused without just cause" to pay under the Policy's duty to defend.

## V.   CONCLUSION

Executive Risk's motion for summary judgment (Doc. 35) is denied in part and granted in part. The Policy issued by Executive Risk does not provide coverage for the counter-claims of Idbeis, Reader, and Benton in the Underlying Actions, but does provide coverage for all other counter-claims. A fact issue remains whether Executive Risk refusal to pay was "without just cause or excuse."

Plaintiffs' joint partial motion for summary judgment (Doc. 41) is similarly denied in part and granted in part. Executive Risk breached its duty to defend the counter-claims in the Underlying Actions, other than the counter-claims by Idbeis, Reader, and Benton.

The court has fully resolved Executive Risk's duty to defend under the Policy. Issues for resolution remain regarding plaintiffs' damages for that breach and whether plaintiffs are entitled to attorneys' fees for Executive Risks failure to pay. In accordance with the court's previous order (Doc. 45), the parties shall file a joint pretrial order within one month of the date of this order.

A motion for reconsideration of this order is not encouraged. Any such motion shall not exceed 3 double-spaced pages and shall strictly comply with the standards enunciated by this court in <u>Comeau</u>

v. Rupp, 810 F. Supp. 1172, 1174 (1992).  The response to any motion
for reconsideration shall not exceed 3 double-spaced pages.  No reply
shall be filed.

     IT IS SO ORDERED.

     Dated this __7th__ day of July, 2008, at Wichita, Kansas.

                     s/Monti Belot
                     Monti L. Belot
                     UNITED STATES DISTRICT JUDGE